J. Russell LONG, Plaintiff,

v.

**AT & T INFORMATION SYSTEMS INC., Defendant.**

85 Civ. 8770 (WCC).

United States District Court,
S.D. New York.

March 20, 1990.

Charles Berkman, Arnold Lande, David Waller, Law Student, of counsel, Brooklyn, for plaintiff.

Benetar Bernstein Schair & Stein, Michael I. Bernstein, Kenneth D. Stein, Robert L. Becker, George D. Zuckerman, of counsel, New York City, for defendant.

WILLIAM C. CONNER, District Judge:

In this action, plaintiff asserts that defendant engaged in a host of discriminatory employment practices and retaliatory actions in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law ("Human Rights Law"), N.Y.Exec.Law § 290 *et seq.*, as well as racial discrimination in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Defendant moves for summary judgment on all of plaintiff's claims pursuant to Fed.R.Civ.P. 56(c). For the reasons set forth below, defendant's motion is granted in part and denied in part.

## BACKGROUND

Plaintiff J. Russell Long, a 38–year–old black male, was employed by New York Telephone Company ("NY Tel"), first as an Account Executive ("AE") and then as an Account Executive Industry Consultant ("AEIC") in the Forest Products Industries Division between June 16, 1980 and December 31, 1982.[1] Plaintiff was then employed by defendant AT & T Information Systems Inc. ("AT & T–IS"), formerly named American Bell, Inc. ("ABI"), between January 1, 1983 and November 4, 1985, as an AEIC assigned to a branch in the manufacturing sector.[2] This position entailed leasing, and later selling, voice and data equipment to customers serviced by AT & T–IS's Large Business Systems division and often neces-

---

1. AEIC status was achieved through a combination of sales performance and the completion of a written project. Candidates were interviewed prior to certification and thereafter allegedly received better accounts.

2. At the time plaintiff worked for NY Tel, it was a Bell Operating Company. ABI was created as a wholly owned subsidiary of American Telephone and Telegraph Co. ("AT & T") as a result of a ruling by the Federal Communications Commission dealing with the selling of customer premised equipment. ABI began operations on January 1, 1983. Its corporate name was changed to AT & T–IS on August 23, 1983.

sitated meeting at the customer's place of business. At all relevant times, both AEs and AEICs were compensated on the basis of salary and potential commissions, on a 70%–30% basis.

On June 24, 1983, Long suffered a back and leg injury and was unable to return to work until November 1, 1983. Upon his return, Long was placed on limited duty because of work-related restrictions recommended by his doctor and concurred in by defendant's medical department.[3] A special position was created in which Long was initially assigned administrative duties and then assigned to an account team where he assisted in the coordination and delivery of equipment for television events. According to AT & T–IS, these duties were normally performed by a Marketing Support Specialist ("MSS"), a classification paid at a lower level than the AE and AEIC classifications. Long claims that many of his job functions were those typically performed by AEs or AEICs.

In December 1984, defendant's medical department determined that Long's disability was permanent. Plaintiff was told that he could no longer continue indefinitely in the position which was created on the assumption that his disability was temporary and that a search would be conducted to find him an appropriate permanent position. Both the extent of the search and the conditions imposed on it by plaintiff are vigorously disputed by the parties. For example, various employees of defendant attest that plaintiff informed them in connection with the search that he would only work in New York City, while Long contends that, notwithstanding his expressed preference for a New York position, he was willing to consider other areas as well. AT & T–IS claims that a lateral job search was conducted within the New York industrial area between December 1984 and January 1985 and that a lateral and downgraded job search was conducted between February and October of 1985. AT & T–IS also claims that company-wide downsizing of approximately 24,000 jobs significantly re-

duced the number of available positions. AT & T–IS maintains that plaintiff was discharged from his position on November 4, 1985 because a suitable permanent position could not be found.

During Long's employ, he filed one charge of discrimination and two charges of retaliation, one of which he amended, with the Equal Opportunity Employment Commission ("EEOC"). After his employment was terminated, plaintiff filed another EEOC charge alleging both discrimination and retaliation.

## DISCUSSION

### I. Section 1981 Claims

In *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court substantially narrowed the scope of section 1981. Cautioning against straining the clear meaning of the section, the Supreme Court held that section 1981 protects two rights: the right to "make" contracts and the right to "enforce" contracts. *Id.* 109 S.Ct. at 2372. The Supreme Court ruled, "[w]here an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief." *Id.*

According to *Patterson*, the right to "make" contracts, "extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment." *Id.* In other words, the right to make contracts does not include the employer's conduct after the initial contract relationship has been established. With respect to the right to "enforce" contracts, this right "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race." *Id.* 109 S.Ct. at 2373. It also covers "wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Id.* In light of these principles, this Court now turns to the present action.

---

**3.** Specifically, Long was to refrain from prolonged walking, sitting or heavy lifting. Long's doctor also recommended that he be provided a company car to avoid public transportation.

■ It is clear that Long's discrimination claims regarding his working assignments, accounts, compensation and benefits for his alleged job-related injury relate to postformation conduct concerning his terms and conditions of employment and as such are not actionable under section 1981. *Patterson*, 109 S.Ct. 2363; *Gonzalez v. Home Ins. Co.*, 50 Fair Empl.Prac.Cas. 1173 (BNA), 1989 WL 106467 (S.D.N.Y.1989); *Williams v. National R.R. Passenger Corp.*, 716 F.Supp. 49 (D.D.C.1989).

### A. Termination

■ *Patterson* did not specifically address the applicability of section 1981 to discriminatory termination. However, the vast majority of cases subsequent to *Patterson* hold that discriminatory termination involves neither the right to make nor the right to enforce contracts. *See Gonzalez*, 50 Fair Empl.Prac.Cas. 1173 (BNA) (S.D.N.Y.1989); *Alexander v. N.Y. Medical College*, 721 F.Supp. 587 (S.D.N.Y.1989); *Overby v. Chevron U.S.A., Inc.*, 884 F.2d 470 (9th Cir.1989); *Hall v. County of Cook*, 719 F.Supp. 721 (N.D.Ill.1989).[4] As noted in *Alexander*, actions such as demotions and retaliatory discharges take place *after* the initial employment contract is made and therefore do not implicate the making of the contract itself. *Alexander*, 721 F.Supp. at 588. Long's termination, which occurred almost three years after his initial employment contract with AT & T-IS, constitutes postformation conduct not covered by section 1981. Nor is the right to enforce contracts implicated in any way. Thus, Long's termination does not fall within the scope of section 1981.

### B. Retaliation

■ Long argues that in retaliation for his attempts to enforce his contract rights, AT & T-IS denied him promotions, created a hazardous work environment, subjected him to racial slurs and ultimately terminated his employment. AT & T-IS claims that these charges relate to postformation conduct and that to hold otherwise would circumvent Title VII's administrative scheme. This Court agrees that retaliation claims are not actionable under section 1981.[5]

Courts have employed various rationales to except retaliation claims from section 1981's coverage. In *Williams*, the district court stated that, while plaintiff alleged that defendant tried to impede her efforts to pursue her remedies for racial discrimination by downgrading her position, the plaintiff did not allege that the defendant tried to impede plaintiff from enforcing any contract rights, as defined in *Patterson*. According to the district court, "once the Court has concluded that the claims of discrimination in working conditions and pay do not involve contract rights as defined in *Patterson*, it must follow that the claim of retaliation against the plaintiff for pursuing these other claims is not a claim that involves contract rights." *Williams*, 716 F.Supp. at 52.

In *Matthews v. Northern Telecom, Inc.*, No. 88 Civ. 583, 1989 WL 131343 (S.D.N.Y. Nov. 1, 1989), and *Dangerfield v. Mission Press*, 50 Fair Empl.Prac.Cas. 1171 (BNA), 1989 WL 88199 (N.D.Ill.1989), the courts applied a different rationale for finding retaliation claims not actionable under section 1981. The *Matthews* court cited the language in *Patterson*, in which the Supreme Court quoted with approval the statement that the right to enforce contracts refers to "the removal of *legal* disa-

---

4. Long has pointed to only one case, *Padilla v. United Airlines*, 716 F.Supp. 485 (D.Colo.1989), which supports his position that section 1981 covers discriminatory termination. In that case, the district court interpreted the right to make contracts as the right to enjoy the benefits of those contracts, an interpretation which cannot be reconciled with the *Patterson* decision. Indeed, the reasoning of *Padilla* has been explicitly rejected by other courts. *See e.g. Rivera v. AT & T Information Sys.*, 719 F.Supp. 962 (D.Colo.1989); *Hall, supra*, 719 F.Supp. 721.

5. In *Patterson*, the Court wrote "provided that plaintiff's access to state court or any other dispute resolution process has not been impaired by ... [a] private actor, the plaintiff is free to enforce the terms of the contract ... and cannot possibly assert, by reason of the breach alone, that he has been deprived of the same right to enforce contracts ..." *Patterson*, 109 S.Ct. at 2376.

bilities to ... enforce a contract." 109 S.Ct. at 2373 (quoting *Runyon v. McCrary*, 427 U.S. 160 n. 5, 96 S.Ct. 2586 n. 5, 49 L.Ed.2d 415 (1976) (dissenting opinion)). The *Matthews* and *Dangerfield* courts found that even if the employer's retaliatory behavior placed practical hindrances in plaintiff's way, it had not caused a legal obstruction to plaintiff's case and therefore was not within the scope of section 1981. *See also Alexander*, 721 F.Supp. at 588 ("a retaliatory discharge in no way obstructs access to judicial redress, as is evidenced by [plaintiff's] presence before this Court").

Lastly, the Ninth Circuit Court observed in a retaliatory discharge suit:

Reading section 1981 too broadly would permit plaintiffs to circumvent Title VII's detailed statutory prerequisites to bringing an action in federal court, thereby frustrating Title VII's conciliatory goals and disrupting the delicate balance between employers and employee's rights. This concern is particularly apt where, as here, the very conduct complained of centers around one of Title VII's conciliatory procedures: the filing of an EEOC complaint. Because section 704(a) of Title VII proscribes Chevron's alleged conduct, we therefore decline "to twist the interpretation of another statute (§ 1981) to cover the same conduct."

*Overby v. Chevron U.S.A., Inc.*, 884 F.2d at 473 (citations omitted).

For these reasons, the Court declines to include retaliatory conduct within the ambit of section 1981. As in *Williams* and *Matthews*, AT & T–IS did not create legal obstacles which foreclosed plaintiff's access to a forum to hear his claim. Moreover, this Court finds the Ninth Circuit Court's concerns in *Overby* persuasive. In light of *Patterson's* strict interpretation of section 1981, this Court will not read section 1981 to encompass plaintiff's claims of retaliatory conduct.

## C. Promotion

In *Patterson*, the Supreme Court stated, "whether a promotion claim is actionable under § 1981 depends upon wheth-er the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." 109 S.Ct. at 2377. The Supreme Court went on to say, "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. *Cf. Hishon v. King & Spaulding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (refusal of law firm to accept associate into partnership) (Title VII)." *Id.* As some courts have recognized, the Supreme Court's reference to *Hishon* suggests that some fundamental change is necessary. *See Byrd v. Pyle*, 728 F.Supp. 1 (D.D.C.1989); *Crader v. Concordia College*, 724 F.Supp. 558 (N.D.Ill.1989).

District courts have only recently begun to distinguish between those promotions which constitute a fundamental change in the contract relationship and those which do not. *See Williams v. Chase Manhattan Bank*, 728 F.Supp. 1004 (S.D.N.Y.1990) (collecting cases). It is not necessary in the context of this case to engage in a lengthy discussion of considerations which courts have found relevant, as Long has not alleged denial of promotion to any position which would create a new and distinct relationship. While Long made general references to "market or area staff positions" for which he was qualified, AT & T–IS maintains that these positions would not have entailed supervisory responsibility, even if they resulted in a base pay increase. However, since higher pay is a typical result of promotion, this alone cannot constitute a new and distinct relationship. *See Williams*, 716 F.Supp. at 51. The only specific position which Long mentioned involved the promotion of an AEIC to Staff Manager, a pay increase of two grade levels. Plaintiff fails to allege that this position entailed any increased supervisory responsibility or change in duties sufficient to amount to a new relationship. Plaintiff therefore fails to state a section 1981 claim. *See Byrd*, 728 F.Supp. at 2 (more than a mere increase in pay and/or responsibility is needed for failure to promote claims to fall within § 1981).

### D. Interference with Ability to Make Future Contracts

Long claims that AT & T–IS made derogatory remarks about him to future employers which constituted interference with Long's ability to make contracts, actionable under section 1981. This Court need not consider whether such behavior falls within section 1981, however, as Long has presented no evidence that such conduct in fact took place. Long bases his assertion on the fact that when his wife, posing as a personnel representative, called Lester Hutton, Marketing Manager at AT & T–IS, to inquire about Long's performance at AT & T–IS, she was informed that Long was disruptive and had initiated a legal action against AT & T–IS. However, Long's wife admits that she did not call Hutton on behalf of any employer or prospective employer. Furthermore, neither Long nor his wife claim to have any evidence that AT & T–IS employees actually spoke to any prospective employers. Accordingly, Long has failed to state a claim for interference with plaintiff's ability to make contracts.

### II. Pendent State–Law Claims

Long filed four administrative charges and one amended charge with the EEOC, the federal agency which enforces Title VII. Pursuant to Title VII, the EEOC referred the charges to the State Division of Human Rights ("State Division") for filing and investigation.[6]

Under the New York State Human Rights Law, N.Y.Exec.Law § 290 *et seq.*, a direct filing of a complaint with the State Division by the aggrieved party constitutes an election of remedies and results in the loss of the right to sue in state court.[7] *Ramos v. New York City Police Dept.*, 127 Misc.2d 872, 878, 487 N.Y.S.2d 667 (Sup.Ct., 1985); *accord Meschino v. Int'l Tel. & Tel. Corp.*, 563 F.Supp. 1066 (S.D.N.Y.1983). Several judges in this district have ruled that such an election prevents them from entertaining pendent jurisdiction over a Human Rights claim. *See e.g., Keeley v. Citibank*, 711 F.Supp. 157, 161 (S.D.N.Y.1989); *Klotsche v. New York City,* 621 F.Supp. 1113, 1116 (S.D.N.Y. 1985); *Koster v. Chase Manhattan Bank,* 609 F.Supp. 1191, 1196–97 (S.D.N.Y.1985). In contrast, other judges in this district have exercised pendent jurisdiction over Human Rights claims when the plaintiff did not file directly with the State Division, but with the EEOC, which then turned the claim over to the State Division, because no meaningful election by the plaintiff had occurred. *See O'Brien v. King World Prod., Inc.*, 669 F.Supp. 639, 640 (S.D.N.Y. 1987); *Selbst v. Touche Rosse & Co.*, 587 F.Supp. 1015, 1016–17 (S.D.N.Y.1984).

In the recent case of *Scott v. Carter–Wallace, Inc.*, 147 A.D.2d 33, 541 N.Y.S.2d 780 (1st Dept.1989), the Appellate Division held that a person who files a charge of unlawful discrimination with the EEOC is also barred from pursuing a remedy in state court on the state law claim.[8] In other words, the EEOC acts as claimant's agent in electing to proceed in an administrative forum under the Human Rights Law. Defendant argues that this Court is bound to find that plaintiff's filing with the EEOC constituted an election of remedies under the *Scott* decision and to dismiss plaintiff's pendent state-law claims.

---

6. Title VII provides that when a state or local agency authorized to grant or seek relief against employment exists, no charge may be filed with the EEOC before the expiration of 60 days after proceedings have been commenced under state or local law, unless such proceedings are earlier terminated. 42 U.S.C. § 2000e–5(c). The EEOC has developed the practice of automatically referring charges to the state or local agency and deferring its own filing of the charge until the 60–day period is met. *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980).

7. Section 297(9) provides, in relevant part:
 Any person claiming to be aggrieved ... shall have a cause of action in any court of appropriate jurisdiction ..., unless such person had filed a complaint hereunder or with any local commission on human rights ...

8. In its decision, the *Scott* court overruled *Rodriguez v. B. Altman & Co.*, 47 Fair. Empl. Pract.Cas. (BNA) 781 (N.Y.Sup.Ct.1984) which held that an election of remedies occurred only when the plaintiff directly files with the state agency.

Contrary to defendant's assertion, although a state court would be required to dismiss plaintiff's state-law claims, *Scott* does not prohibit the exercise of pendent jurisdiction by a federal court. *See Tasaka v. DDB Needham Worldwide, Inc.*, 729 F.Supp. 1014 (S.D.N.Y.1990); *Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494 (S.D.N.Y.1989). These cases conclude that while *Scott's* logic applies to state courts because it contravenes the purpose of the Human Rights Law to allow duplicative state proceedings and thereby waste state resources, the same concerns are not present with the exercise of pendent jurisdiction, where a plaintiff who files a Title VII claim expects a federal forum.

The *Scott* court clearly considered it "anomalous and unfair that access to *State* court should be available to a grievant who initially files with the EEOC but not to one who initially files with the State Division." *Scott*, 147 A.D.2d at 38, 541 N.Y.S.2d 780 (emphasis added). However, refusing to exercise pendent jurisdiction based on *Scott* creates another anomaly. A plaintiff who brings only a Human Rights Claim has a choice of proceeding in state court or bringing the charge to the State Division for resolution. Yet a plaintiff who wishes to bring a Title VII claim, which necessitates filing with the EEOC, in addition to a State Human Rights Law claim, will be precluded from *any* court resolution of the state law claim if the federal court refuses to exercise pendent jurisdiction. As stated in *Giuntoli*, 726 F.Supp. at 503, "[t]hat th[e] option [of pursuing state law claims in a judicial forum] is lost ... for no reason other than [plaintiff's] desire to pursue her federal remedies as well weighs in favor of this Court's exercise of pendant [sic] jurisdiction over the state claim." [9] Thus, a federal court may exercise pendent jurisdic-

tion over Human Rights Law claims as a matter of discretion.

■■■ Under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), a federal court has the power to hear a pendent state-law claim where there is a federal claim and the state and federal claims are so related that they would ordinarily be tried together. As there is a common nucleus of operative fact among Long's federal law and state-law claims, all of which arise out of AT & T-IS's alleged discriminatory conduct, the issue is whether the Court should exercise its discretion to hear the pendent claims. The Court concludes that "considerations of judicial economy, convenience and fairness to litigants," *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, do not warrant the entertainment of the state-law claims because plaintiff's conduct in reopening the administrative proceedings effectively amounted to an election to proceed before the State Division.

This Court disagrees with AT & T-IS' contention that plaintiff's participation in the State Division proceedings in itself constitutes an election of remedies. Long argues that while he participated in State Division proceedings, he should not be "penalized" for his participation in a system designed by Congress to avoid litigation. This argument has merit. Sending charges to state agencies "is intended to give state agencies a limited opportunity to resolve problems of employment discrimination and thereby to make unnecessary, resort to federal relief by victims of the discrimination." *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); *see also Gaslight*, 447 U.S. at 65, 100 S.Ct. at 2031 ("Congress viewed pro-

---

**9.** In *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479 n. 20, 102 S.Ct. 1883, 1896 n. 20, 72 L.Ed.2d 262 (1982), the Supreme Court expressly declined to decide whether federal courts had exclusive jurisdiction over Title VII claims. Circuit courts which have resolved this issue have reached conflicting results. *Compare Bradshaw v. General Motors Corp.*, 805 F.2d 110 (3d Cir. 1986) (exclusive jurisdiction), *Valenzuela v. Kraft, Inc.*, 739 F.2d 434 (9th Cir.1984) (same), *with Donnelly v. Yellow Freight Sys., Inc.*, 874

F.2d 402 (7th Cir.1989) (concurrent jurisdiction). The Second Circuit has not decided whether Title VII vests jurisdiction exclusively in the federal courts. Without purporting to reach this issue in any way, this Court notes only that a finding that federal courts have exclusive jurisdiction over Title VII claims would increase the unfairness to a litigant who wishes to bring a Title VII claim and prefers a judicial forum for resolution of his state law claims.

ceedings before the EEOC and in federal courts as supplements to available state remedies for employment discrimination. Initial resort to state and local remedies is mandated, and recourse to federal forums is appropriate only when the State does not provide prompt or complete relief.") Since a goal of the administrative scheme is to resolve problems quickly and informally, declining to exercise pendent jurisdiction in cases where a plaintiff participates in any fashion in State Division proceedings would have the perverse effect of encouraging plaintiffs not to cooperate with the State Division, thereby precluding or diminishing the opportunity to obtain a speedy resolution of their claims.

In this case, however, Long's reopening of his case in the State Division constitutes conduct equivalent to an initial filing with the State Division and leads this Court to determine that the exercise of pendent jurisdiction in this case would be, on balance, both inefficient and unfair. Long's behavior subsequent to the State Division's determination of no reasonable cause clearly evidences Long's personal intent and decision to proceed in front of the State Division. This case is thus similar to the pre-*Scott* cases which declined to exercise pendent jurisdiction because the plaintiff meaningfully chose an administrative forum by filing initially with the State Division.

Long wrote to the Governor of New York on July 11, 1985, identifying himself as "a 1983 complainant to the New York State Division on Human Rights" and complaining about the result reached in his claim by the State Division.[10] Long also requested a review of the entire State Divi-

sion process for handling complaints. On October 18, 1985, the State Division notified Long that, with his approval, the State Division was willing to treat his letter to the Governor as an application to reopen the prior proceedings. A letter dated January 26, 1986 notified all interested parties that "Complainant has applied to reopen the above-entitled matter." While plaintiff asserts that he was without counsel and thus did not understand the ramifications of his actions, plaintiff clearly had counsel prior to the issuance of this notice as his attorney was listed as one of the people to whom it was sent.[11]

On July 8, 1986, the State Division conducted a fact-finding conference at which Long appeared with an attorney and more than ten witnesses. At the conference, although the notice scheduling the conference limited the issues to plaintiff's termination, Long sought and received permission to discuss the claims made in his prior charges as well. On or about January 21, 1987, the State Division notified the parties that the matter was reopened. More recently, by notice dated July 28, 1989, the State Division informed the parties that the charges reopened pursuant to Long's application would be scheduled for a public hearing.

Were this Court to entertain plaintiff's state-law claim, which plaintiff was instrumental in bringing before the State Division for the second time, plaintiff would have two opportunities to litigate the same claim with the possibility of inconsistent results. Clearly, this is inefficient, as well as unfair. As the State Division is already in the midst of dealing with the claim plain-

**10.** Plaintiff could have requested a right-to-sue letter at this point, although there is no evidence plaintiff was aware of this option. If the EEOC does not file suit, or enter into a conciliation agreement to which the complainant is a party within 180 days after it assumes jurisdiction, the complainant has the right to request and receive issuance of a right-to-sue letter which allows complainant to bring a civil action within 90 days. 29 C.F.R. 1601.28(a)(1). Plaintiff's first discrimination charge was filed in October 1983 and plaintiff obtained his first right-to-sue letter on October 7, 1985. Plaintiff filed his original complaint with this Court on November 6, 1985.

**11.** Long also claims that around this time, he called the EEOC and asked them to review the State Division's findings. According to Long, on February 26, 1986, the EEOC concluded there was no reasonable cause to believe plaintiff's claim based on the findings of the State Division. Long argues that this led him to believe the EEOC and State Division proceedings were over and to file his complaint in federal court on November 6, 1985. The Court fails to see the significance of this argument, in addition to noting the obvious inconsistency that plaintiff's complaint was filed four months before the EEOC's finding.

tiff took affirmative action to reopen, plaintiff's state-law claim is more appropriately resolved by the State Division and this Court declines to exercise pendent jurisdiction over it.

### III. Title VII Claims

■■■ In a race-based discriminatory treatment suit, an employee alleges that because of his race he has been treated less favorably than others similarly situated. Discriminatory treatment claims require an intent to discriminate, although a prima facie case can be established without actual proof of intent. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The Supreme Court has described the order and allocation of proof as follows:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employment [decision]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* 450 U.S. at 253, 101 S.Ct. at 1093. A plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. Because this is a motion for summary judgment, this Court's function is limited to determining whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While this Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party, the non-moving party must offer more than conclusory allegations of discrimination to show the existence of genuine issues of material fact. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### A. Discrimination in Compensation

■■■ Plaintiff alleges both individual and pattern and practice discrimination based upon his race and sex, as well as upon his marital and family status.[12] In his brief, plaintiff argues that AT & T–IS did not discriminate against him on the basis of either race or sex standing alone, but on a combination of the two, and the Court confines its inquiry accordingly.

■■■ In order to prove pattern or practice discrimination, plaintiff must "establish by a preponderance of the evidence that racial discrimination was the Company's standard operating procedure—the regular rather than the unusual practice." *Teamsters,* 431 U.S. at 385, 336, 97 S.Ct. at 1880, 1854; *see also Bazemore v. Friday,* 478 U.S. 385, 394, 398, 106 S.Ct. 3000, 3005, 3007, 92 L.Ed.2d 315 (1986). Thus, plaintiff must show AT & T–IS's regular procedure was to compensate black males in his position less than others similarly situated.

■■■ It is undisputed that plaintiff's compensation was based on the same formula as all other AEs and AEICs—70% based on salary and 30% based on potential commissions. Defendant has presented this Court with salaries of AEs and AEICs in the manufacturing department in plaintiff's branch office to support its claim that neither plaintiff nor black males as a group were discriminated against in terms of

---

**12.** Title VII does not prohibit discrimination on the basis of marital or family status and this

Court therefore will not inquire into whether such discrimination occurred.

compensation. Plaintiff offers two charts of his own to support his claims of discrimination. Plaintiff's first chart covers 1983 and consists of 41 names, including nineteen whom plaintiff acknowledges were not in plaintiff's branch in the corporation in 1983. Plaintiff's Exh. V. Plaintiff also includes two individuals who, according to defendant, were promoted to different positions with higher salary grades during the relevant time. Long also provides six-month and twelve-month averages of salaries broken down by race and by sex.[13] Since plaintiff's data is flawed by its inclusion of employees who are not in positions comparable to plaintiff's, this Court turns to the data supplied by defendant.

Defendant's records show there were only two black males of the eleven people in the relevant group in 1983, one whose salary was above the median and plaintiff, whose salary was at the median, even though plaintiff received only half pay under the applicable sickness disability benefit plan after November. Warnock Reply Aff., Exh. 1. A review of salaries provided by the parties for 1984 and 1985 also demonstrates that plaintiff has failed to present material facts by which a jury could find that defendant had a pattern of discriminatorily compensating black males. Plaintiff has not offered any evidence that black males as a group were assigned substandard accounts, which would lead to a lower rate of compensation. Even if these salary comparisons were to provide evidence of discrimination, the small size of these groups would make it difficult to draw inferences from the evidence provided, *see Pirone v. Home Ins. Co.*, 559

F.Supp. 306, 312 (S.D.N.Y.1983) (sample of 16 or 18 people too small to be meaningful), especially considering that salary levels were not only affected by the mix of accounts given to the AE or AEIC but also by factors such as the individual's ability to develop assigned accounts.

With regard to discriminatory treatment against plaintiff individually, plaintiff argues that substandard accounts assigned to him accounted for his low income in 1983.[14] Plaintiff has pointed to no evidence by which discriminatory intent in assigning accounts can be inferred. Plaintiff was given 39 accounts when he started at AT & T-IS. He argues that only four of his accounts involved companies with more than forty business lines and he did not receive any lucrative National Accounts, although two white AEs received them. One of plaintiff's accounts, American Standard, was a local account when assigned to him, although it was subsequently reclassified as a National Account after it was assigned to a black male AE several months after plaintiff's accident. Plaintiff claims the reclassification occurred because the new AE benefitted from a proposal created by plaintiff before his accident.

Defendant argues that the eventual success of the American Standard account shows that plaintiff did not receive only bad accounts. Defendant further maintains that because AT & T-IS was a newly-formed entity, it was unfamiliar with all of the accounts when they were initially assigned. Lastly, Branch Manager Marsha Gewirtzman told plaintiff he should concentrate on those which seemed most productive. Defendant's explanation convincingly

**13.** Excluding the employees which plaintiff admits are incorrectly included and assuming that the other employees are properly included results in a group consisting of two black males, three black females, seven white males, eight white females, one hispanic female and one asian male. With this small sample size, plaintiff's comparison of "average" salaries may present distorted results as a small number of very high or low salaries will disproportionately affect the averages. *Cf. Knutson v. Consolidated Boeing Corp.*, 655 F.2d 999, 1001 (9th Cir.1981).

**14.** Plaintiff also asserts a discriminatory compensation claim that he was denied maximum

disability benefits based on his race because AT & T-IS treated his injury as non-job related. Plaintiff offers no proof of discriminatory motive beyond his belief that the decision was based on race and presents no evidence that employees injured under similar circumstances were treated differently. Plaintiff further claims that he received fewer benefits upon his termination than employees laid off in connection with the downsizing, but because plaintiff was not laid off because his position was declared a "surplus" category, he was not entitled to the same benefits. No facts exist, therefore, to support either claim.

rebuts any prima facie case of discriminatory treatment with respect to compensation, and plaintiff offers no other evidence to raise a material issue of fact.

█ After plaintiff returned to work following his injury, AT & T–IS claims that plaintiff's duties were more in line with those of the lower-graded MSS, although plaintiff continued to be compensated based on the same formula as AEs and AEICs.[15] Assuming his responsibilities in his temporary position were comparable to AEs and AEICs in his branch, they had the potential to earn commissions which plaintiff was unable to earn in the temporary position created for him. Plaintiff, however, was still paid as if he earned commissions. In light of this fact, plaintiff cannot support his claim that he was discriminated against in terms of compensation.

## B. Discrimination in Promotion

█ To establish a prima facie case of discriminatory treatment with respect to promotion, a plaintiff must show 1) he belongs to a protected class; 2) he applied for a position for which the employer was seeking applicants; 3) despite his qualifications, he was rejected; and 4) the position remained open or was later filled by a white.[16] Sweeney v. Research Found. of State Univ. of N.Y., 711 F.2d 1179, 1185 (2d Cir.1983). While plaintiff alleges that he was denied promotions because he was "blackballed" by AT & T–IS which placed his desk in an inaccessible area, called him racial epithets and gave him bad accounts, plaintiff must nonetheless meet the above factors in order to establish a prima facie claim.

█ AT & T–IS claims that plaintiff has failed to establish a prima facie case because he cannot demonstrate he was qualified for a promotion. According to AT & T–IS, the most important consideration for promotion of AEs and AEICs was sales performance.[17] Defendant argues that plaintiff made only minimal sales during his first six months of employment, and the only AEIC, a white male, who was promoted, to Staff Manager, was among the top salespersons in the preceding six-month period.[18]

█ After six months, plaintiff went on disability leave until November 1, 1983. Upon his return to work, his job did not involve sales. AT & T–IS contends that due to plaintiff's removal from sales, as required by his disability, plaintiff was simply not a candidate for promotion. The AEs and AEICs who were promoted were, unlike plaintiff, actually performing the sales job associated with their title, while plaintiff, although he retained his title as AEIC, performed different duties. For evidence of the promotions of others to be relevant, it is essential that they be similarly situated. See Lieberman v. Gant, 630 F.2d 60, 68 (2d Cir.1980); Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531, 1546–47 (S.D.N.Y.1986), aff'd, 814 F.2d 653 (2d Cir.1987). Because plaintiff cannot show he was qualified for the positions to which he refers, plaintiff cannot establish a prima facie case of dis-

---

15. Plaintiff was paid his base salary as an AEIC plus an additional 30%, a salary higher than any MSS in his office. AT & T–IS claims they compensated plaintiff at this rate because the company considered it unfair that he should be deprived of earnings from commissions during his period of temporary disability.

16. This standard must of course be adapted to the specific facts at hand. For example, defendant does not contest that plaintiff's claim fails because he was unable to show he applied for a particular promotion because notice of the positions were not posted.

17. While plaintiff claims that AEIC certification took into account factors other than sales performance and that he was never informed by defendant that sales performance was the most important factor in promotion, this does not refute AT & T–IS' assertion.

18. Plaintiff claims that five other named individuals in his department were promoted between January and June 1983. AT & T–IS argues that none of these individuals was promoted in this time period, although one of them was transferred in October 1983. Plaintiff does not identify the positions to which he claims they were promoted or discuss their qualifications for these positions in comparison to his own. Plaintiff also asserts that different standards applied to promotions of blacks and whites but fails to substantiate this vague and conclusory assertion as well.

crimination in promotion. Summary judgment is granted as plaintiff has failed to present sufficient evidence to allow a jury to conclude that his failure to be promoted was motivated by racial discrimination.

### C. Discrimination in Termination

 Long's employment was terminated by Lester Hutton and Michael Levy, two managers who purportedly referred to him in racially derogatory terms in discussing their desire to fire him.[19] This conversation certainly raises an inference of discrimination sufficient to constitute a *prima facie* case. *See Thermidor v. Beth Israel Medical Center*, 683 F.Supp. 403 (S.D.N.Y. 1988) (racial comment directed to plaintiff sufficient to establish *prima facie* discriminatory discharge claim). When a plaintiff has direct evidence of discriminatory animus, it is unnecessary to satisfy all the elements of the *McDonnell–Douglas* test. *See Stanojev v. Ebasco Serv., Inc.*, 643 F.2d 914, 920–21 (2d Cir.1981). The elements of proof in employment discrimination cases were not intended to be "rigid, mechanized or ritualistic." *Meiri v. Dacon*, 759 F.2d at 996 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

 Thus, AT & T–IS's argument that Long has failed to identify any white or female AEs or AEICs who were treated more favorably than he in a similar situation, i.e. who were permitted to remain in a special position beyond a period of temporary disability or whose employment was not terminated when a permanent position consistent with their geographic and medical restrictions was not located, does not end this Court's inquiry. If pointing to comparable treatment of non-minority workers in similar situations were the only way to prove discrimination, a black plaintiff could never prove discrimination if he were discharged under conditions not experienced by whites. Clearly, this is not the law under Title VII. *See Warren v. Quality Care Serv. Corp.*, 603 F.Supp. 1174, 1180 n. 7 (W.D.N.Y.1985).

 Similarly, that Long has failed to establish that the position designed to accommodate his temporary disabilities remained open or that a replacement was sought does not show plaintiff cannot meet elements essential to his claim. *See Burdine* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6 (*McDonnell–Douglas* standard not inflexible); *Meiri*, 759 F.2d 989 (inference of discrimination not eliminated by fact that plaintiff was not replaced by someone outside the protected class or anyone else); *Wooten v. New York Tel. Co.*, 485 F.Supp. 748, 760 (S.D.N.Y.1980) (same). Furthermore, a plaintiff need not show that a replacement was hired where the employer is reducing his work force. *See Stanojev*, 643 F.2d at 920–21; *McCuen v. Home Ins. Co.*, 633 F.2d 1150, 1151 (5th Cir.1981) (age discrimination).

Therefore, the burden switches to AT & T–IS to produce evidence that Long was discharged for a legitimate nondiscriminatory reason to dispel the adverse inference created by plaintiff's *prima facie* case.

---

**19.** According to the deposition testimony of Long's co-worker Ms. Henry, after 5:00 one day, she overheard Hutton and Levy discussing Long as they walked by her desk. According to Henry, Hutton said, "You know, what are we going to do about J.R." and Levy replied, "I don't know, but we have to get rid of that black boy sooner or later." Henry Dep. at 17. Defendant argues that Henry's recollection of this conversation is thoroughly implausible and therefore fails to create a genuine issue of fact. Defendant bases this argument on the fact that Henry did not tell plaintiff of this conversation until some time after plaintiff was fired. Moreover, Henry could not remember whether she mentioned this conversation at the State Division proceeding, and it is undisputed that she did not refer to it in the statement she subsequently wrote on plaintiff's behalf to the State Division. The fact that Henry failed to mention this conversation at an earlier time, despite its capacity to bolster plaintiff's claim, is not so incredible as to warrant the denial of summary judgment. Whether Henry's testimony is credible is a determination which must await trial. One additional fact should be noted. Systems Manager Ray Sharkey purportedly made racist comments concerning plaintiff which were overheard by others in the office; however, because these comments were made more than a year before plaintiff was terminated and there is no evidence that Sharkey played a role in this decision, they do not support plaintiff's claim of discriminatory termination. *See Crader*, 724 F.Supp. at 564.

AT & T–IS maintains that Long was terminated because no permanent position could be found to meet his medical and geographic restrictions.[20] While Long claims that permanent positions were available and accommodations could be made to meet his medical restrictions, he fails to identify any job opening in New York. Hutton stated that he checked the "No" box on the Employee Profile Input Form in response to the question whether Long would be willing to relocate after Long told him that he would only work in New York City and would not commute. Hutton Aff. ¶ 5. Long claims not to have seen this indication, although he signed this form on September 3, 1985. Wade Taylor, a Regional Job Accommodation Specialist employed by AT & T–IS, stated that Long had also told him he would not work outside of New York, despite his being informed that this severely limited his possibility of securing a job. Taylor Aff. ¶ 5.

 Since AT & T–IS has articulated legitimate, nondiscriminatory reasons for plaintiff's discharge, to avoid summary judgment plaintiff must establish the existence of factual issues as to whether these "reasons" were merely pretextual. This is not a case where the reason proffered by defendant is unworthy of credence; therefore, plaintiff must persuade the Court that a discriminatory reason more likely motivated his employer.[21] Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff has not merely made conclusory allegations of discrimination based on his subjective perceptions, see Meiri v. Dacon, 759 F.2d at 998, but has articulated actual and particular facts. An employer's discriminatory statement provides sufficient direct evidence to bar summary judgment when it relates to the decision which the plaintiff claims was motivated by discrimination. See Stumph v. Thomas & Skinner, Inc., 770 F.2d 93 (7th Cir.1985). Because plaintiff has evidence of racially derogatory references to him by the people who fired him, and because all reasonable inferences in plaintiff's favor must be drawn, summary judgment is denied.

## IV. Retaliation Claims

 To establish a prima facie retaliation claim, plaintiff must show: protected participation or opposition under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment activity. DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); Davis v. State Univ. of New York, 802 F.2d 638, 642 (2d Cir.1986); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980). A causal connection can be proved either directly or indirectly by showing that the protected activity is followed by adverse treatment. See DeCintio, 821 F.2d at 115; Grant, 622 F.2d at 46. Title VII is violated if a retaliatory motive played a part in the adverse action; it need not be the sole motivating factor. See Grant, 622 F.2d at 46; Abel v. Bonfanti, 625 F.Supp. 263, 268 (S.D.N.Y.1985). Once plaintiff has established a prima facie case, the employer can show a legitimate non-retaliatory reason for the alleged mistreatment. The employee is then entitled to prove that the employer's reason is pretextual. DeCintio, 821 F.2d at 115 (citations omitted).

### A. First Retaliation Charge

 Long filed his first retaliation charge on November 4, 1983, citing incidents which allegedly occurred on November 1 and 2, 1983, when he returned to work after his accident. Long alleged that

---

**20.** It may well be true, as AT & T–IS contends, that it was under no obligation to create a special position for plaintiff due to his disability. See Carter v. Tisch, 822 F.2d 465, 469 (4th Cir.1987) (no duty to assign a light duty position). Nonetheless, having chosen to do so, AT & T–IS could not terminate plaintiff based on his race.

**21.** If this turns out to be a case involving a mix of legal and illegal motives, "defendant can prevail by proving that the adverse action would have been taken if the proper reason alone had existed." Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 878 (2d Cir.1988).

his work area was in disarray, he was assigned clerical functions and Branch Manager Marsha Gewirtzman threatened him with unsatisfactory job references and attempted to pressure him to accept a job transfer. AT & T–IS claims that even if plaintiff's charges are true, Long cannot make out an essential element of his *prima facie* case, that a causal connection existed.

Defendant asserts that it did not receive notice of Long's discrimination charge filed on October 12, 1983 until November 8, 1983 when it received a written notice dated November 3, 1983. McCormick Aff. ¶ 3, Exh. A. Gewirtzman also denies that she knew of Long's charge when she spoke to him upon his return to work. Long claims that Gewirtzman knew of the discrimination charges via a phone call from "Region 1 of the AT & T office" which received the filing on October 26, 1983, as evidenced by a dated "Received" stamp on the notice. Defendant has effectively refuted this claim. Arthur V. Greenridge, a State Division employee, has attested that the "Received" stamp is that of the State Division and the notation "Region 1 a" refers to the area covered by the State Division's lower Manhattan office. Greenridge Aff. ¶ 2. Moreover, Long has not testified to personal knowledge regarding the alleged telephone call to Gewirtzman or attempted to question either Gewirtzman or McCormack about this call in their depositions. Long makes no more than a bald assertion which cannot withstand a motion for summary judgment. As Long has failed to establish that his employer knew of his filing before taking the adverse employment actions, summary judgment is granted on plaintiff's first charge of retaliation.

### B. Amended Retaliation Charge

 On March 28, 1984, Long filed an amendment to his first charge of retaliation alleging that a co-worker, Rudolf Bir-

zin, had threatened his life over an incident concerning plaintiff's radio, and that two other AT & T–IS employees threatened to have him discharged if he persisted in trying to obtain certain job-related information from one of the employee's superiors.

All three employees denied knowledge of the first charge of retaliation and the discrimination charge which preceded it.[22] Long has not claimed that these employees were aware of the charges, but "familiarity with office gossip suggests they probably [knew]." He also argues that they were encouraged to act as they did toward him by AT & T–IS and were put on constructive notice by the way Long was "blackballed" by AT & T–IS. Such unsupported inferences are insufficient to create a genuine issue of fact with respect to these employees' knowledge and plaintiff has failed to establish a *prima facie* claim. *See Hayden v. Atlanta Newspapers*, 534 F.Supp. 1166 (N.D.Ga.1982) (summary judgment granted where plaintiff merely alleged that it was logical to assume that person who took adverse action had knowledge of protected activity).

### C. Second Retaliation Charge

 Plaintiff filed his second retaliation charge on June 7, 1984, claiming that false charges of misconduct had resulted in a formal notice of reprimand and warning of dismissal. On June 4, 1984, Gewirtzman gave plaintiff formal notice reprimanding him for "rude, loud, boisterous, and insubordinate behavior," largely in connection with his interactions with fellow employees, and for failure to leave notice of his whereabouts. Plaintiff argues only that he had previously notified AT & T–IS that the slips used to leave notice of his whereabouts were being removed from his desk. Plaintiff does not address the various inci-

---

**22.** No evidence is provided by either party as to who at AT & T–IS received the November 3, 1983 notice or to whom, if anyone, the information contained therein was circulated. The fact that AT & T–IS received the notice is not sufficient to establish a causal relationship, plaintiff must show that the person who engaged in the adverse conduct had notice of the protected activity. For example, in *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793 (9th Cir.1982), although the EEOC notified a company officer of the EEOC charges, plaintiff failed to establish a *prima facie* retaliation claim concerning an adverse decision made by the District Manager because he was unaware that plaintiff had engaged in a protected activity at the time he acted.

dents in the notice relating to his behavior with fellow employees.

Gewirtzman does not claim that she lacked knowledge of either plaintiff's original filing or amended filing at the time she issued the reprimand, but claims her actions were not in retaliation for the charge which plaintiff had filed. In her deposition, she testified that at some point she saw plaintiff's charge and discussed it with AT & T–IS's Human Resources Department. Because this reprimand was issued shortly after Long's first charge of discrimination, which specifically named Gewirtzman, plaintiff has established a *prima facie* case of retaliation. Gewirtzman's claim that the notice was issued because of Long's behavior adequately rebuts Long's *prima facie* case. Nonetheless, even if it is true, as plaintiff has argued, that he had never been reprimanded before, this alone does not show pretext sufficient to withstand summary judgment.[23] This retaliation claim therefore fails.[24]

▆ Plaintiff further claimed in his charge that AT & T–IS encouraged Birzin, a fellow employee, to file a summons against him. Plaintiff and Birzin had a dispute in March 1984 concerning plaintiff's playing loud music at work, an incident mentioned in plaintiff's previous amended charge of retaliation. The facts are clear, however, that plaintiff filed a summons against Birzin for non-company-related mediation. The mediator dismissed the summons, and according to Birzin, based on plaintiff's disruptive conduct at the hearings, advised Birzin to file a criminal complaint against plaintiff, which Birzin did. Birzin categorically denies knowl-

edge at any time of plaintiff's EEOC charges and further denies that AT & T–IS encouraged him to initiate proceedings against plaintiff. Long admits he has no direct knowledge that Birzin was aware of the previous charges Long had filed, but he believed Birzin acted as he did because he was encouraged to do so by AT & T–IS. According to plaintiff, Birzin was a true "company man," or, in the lingo of AT & T–IS employees, a "Bell-head." The facts do not support any inference that AT & T–IS encouraged Birzin's behavior. Plaintiff's speculation as to Birzin's knowledge is insufficient to create material issues of fact to support a finding that Birzin had knowledge of Long's protected activity. Plaintiff's conjecture that the company encouraged Birzin to take action is unsupported, and cannot withstand defendant's summary judgment motion. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

### D. Third Retaliation Charge

▆ Plaintiff's final retaliation charge was filed November 5, 1985, the day after his job was terminated. Plaintiff alleges his discharge was retaliatory because it occurred within approximately three weeks after the EEOC made its no probable cause determination with respect to plaintiff's first discrimination charge. The two individuals who fired plaintiff claim no awareness of this determination.[25] Plaintiff has failed to establish any knowledge on the part of Levy and Hutton, and therefore fails to establish that the alleged retaliator knew of plaintiff's protected activity.

---

**23.** The Court also notes that there is no indication that this notice adversely effected plaintiff's employment or played any role in the ultimate decision to terminate him.

**24.** Plaintiff raised in his charge the additional claim that AT & T–IS was taking steps to terminate him. Plaintiff offers no evidence of these steps and it is undisputed that plaintiff was not discharged until two years after his first retaliation charge was filed.

**25.** A comparison of plaintiff's Local Rule 3(g) Statement with the admissible evidence provided to this court is instructive. First, plaintiff's

counsel claims that Levy and Hutton were both on a list of individuals who received notice of decisions on discrimination complaints made by government agencies, a fact plaintiff's counsel alleges was confirmed by Leland Burris, former Equal Opportunity Manager. No such list has been presented to this Court nor any testimony of Burris concerning this list. Second, plaintiff's counsel claims that Hutton indicated in a taped interview that he was aware of charges against the plaintiff when plaintiff was discharged. However, the transcript of plaintiff's wife's conversation with Hutton reveals only that Hutton was aware of charges on the date of the conversation, October 6, 1986.

Even if plaintiff could show imputed notice, AT & T–IS argues that because three charges of retaliation were still pending at the time plaintiff was fired, plaintiff cannot argue that his loss of position was motivated by the October 7, 1985 no probable cause determination. In response to this argument, plaintiff contends that AT & T–IS waited until November 1985 to discharge plaintiff in order to rely on its laying off 24,000 employees as pretext. Because plaintiff has failed to establish any knowledge on the part of Levy or Hutton, this contention need not be considered. The Court notes, however, that because plaintiff's other charges were outstanding at the time his employment was terminated, there is no basis to support plaintiff's argument that the termination was retaliatorily motivated.

## V. Claims Relating to Plaintiff's Employment by NY Tel

AT & T–IS argues that all claims of discrimination by NY Tel must be dismissed because 1) plaintiff failed to name NY Tel in any EEOC charge or exhaust his administrative remedies against it; 2) the complaints fail to state a cause of action against NY Tel; and 3) the statute of limitations has run with respect to alleged acts of discrimination by NY Tel. Long asks this Court to treat his filings with the EEOC and this Court against AT & T–IS as timely against all Bell System entities because plaintiff, acting *pro se* at the time, believed they were sufficient to include claims against NY Tel. Long also argues

that if AT & T–IS and NY Tel are distinct entities, AT & T–IS lacks standing to move to dismiss the claims against NY Tel.

 AT & T–IS clearly has standing to challenge plaintiff's claims that NY Tel discriminated against him because plaintiff asserts this claim in a suit brought solely against AT & T–IS.[26] Whether it is necessary to reach the merits of AT & T–IS's motion depends on whether AT & T–IS is responsible for liabilities stemming from allegedly discriminatory treatment which occurred at NY Tel when NY Tel was a wholly-owned subsidiary of AT & T.[27]

A brief history of AT & T–IS is relevant to this inquiry. AT & T–IS, formerly ABI, was created as a new entity in 1982 to sell customer-premises equipment as a result of an earlier proceeding before the Federal Communications Commission. It began operations on January 1, 1983. The Bell Operating Companies ("BOCs"), including NY Tel, continued to own, provide and service existing customer-premises equipment and provide basic transmission services. Approximately $10 million in assets were transferred to ABI from NY Tel in exchange for ABI stock. No existing accounts or title to existing customer's-premises equipment were transferred. The transfer of employees from NY Tel to ABI, most or all of whom were given the option of remaining with NY Tel or going to ABI, also occurred at this time and ABI assumed no obligations with respect to former NY Tel employees relevant to the instant action.

**26.** Plaintiff appears to assume mistakenly that NY Tel is a party to this action. NY Tel was not a named defendant in plaintiff's first or amended complaint. While careful scrutiny into the body of plaintiff's amended complaint reveals two statements which conceivably relate to NY Tel, it is clear that NY Tel never received formal notice of this action and there is no evidence to suggest that they received informal notice. Thus, this case is unlike *Miller v. Director,* 146 F.Supp. 674, 676 (S.D.N.Y.1956), *aff'd,* 243 F.2d 527 (2d Cir.1957), in which an entity not named as a defendant in the action was treated as a party because it had received actual notice of the complaint. Plaintiff has not moved to join NY Tel as a party defendant pursuant to Rule 21 nor has NY Tel been joined as an indispensable party. As the current NY Tel is a completely

separate entity from AT & T–IS, NY Tel is not before this Court and plaintiff cannot obtain a judgment against them.

**27.** Plaintiff's argument heading states that a cause of action exists against *AT & T* for the acts of NY Tel and plaintiff briefly requests piercing its corporate veil, which this Court interprets as asking this Court to hold AT & T liable for the pre-divestiture acts of NY Tel. Plaintiff's argument need not be addressed, as the defendant in this suit is AT & T–IS and not AT & T. This Court notes, however, that plaintiff offers absolutely no facts to support his request, and that the relationship between a parent corporation and its wholly-owned subsidiary is insufficient in itself to pierce the corporate veil.

Under the terms of the divestiture plan, AT & T divested itself of portions of the BOCs and transferred to them sufficient facilities, personnel, systems and rights to technical information so they could perform exchange telecommunications and exchange access functions. AT & T also kept appropriate assets for interexchange functions, customer-premises equipment and directory advertising, through the creation of subsidiaries whose stock was held by AT & T. After these asset transfers were completed, the divested BOCs were reorganized into seven regional operating companies, including NYNEX, of which NY Tel became a subsidiary. AT & T-IS received an unspecified amount of additional assets from NY Tel in connection with the divestiture.

When a corporation sells substantially all its assets to another, the purchasing corporation is only liable for the former's liabilities under certain circumstances. For example, the purchasing corporation is liable if there is an express or implied agreement that the purchaser will assume liabilities. *Wheeler v. Snyder Buick*, 794 F.2d 1228, 1236 n. 8 (7th Cir. 1986). No such agreement exists here. ABI, now AT & T-IS, did not agree to assume NY Tel's potential liabilities to its employees either at the time it began operations or in connection with divestiture.

In *United States v. Western Elec. Co., Inc.*, 569 F.Supp. 1057 (D.D.C.1983), *aff'd sub nom. New York State Dept. of Public Serv. v. United States*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983), the court approved certain aspects of AT & T's reorganization plan with respect to divestiture, including its plan for contingent liabilities. Under the plan, contingent liabilities of the Bell System were apportioned among AT & T and the Operating Companies on the basis of their relative net investment as of the date of divestiture. The plan, while setting forth a formula for the payment of post divestiture judgments, did not create liability by one entity for the pre-divestiture acts of another.

The purchasing corporation may also be liable under the doctrine of succes-sorship liability. Successorship liability has been described as "an extra-contractual remedial tool for imposing certain labor obligations on a new employer that has taken over operations of an old employer." *American Bell, Inc. v. Fed. of Tel. Workers of Pa.*, 736 F.2d 879, 888 (3d Cir.1984). It has specifically been held applicable to Title VII cases. *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1092 (6th Cir.1974); *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228 (7th Cir.1986). In all cases, it involves a fact-specific determination. *See MacMillan Bloedel*, 503 F.2d 1086, 1092 (6th Cir.1974); *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d 865, 869 (2d Cir.1981) (NLRB case).

The relevant factors are whether the successor had prior notice of the claim against the predecessor, the ability of the predecessor to provide relief to the plaintiff, and the continuity of business operations between the predecessor and the successor, which includes such matters as continuity in supervisory personnel, employees, physical plant, location, nature of product or service and methods of producing the product or service. *Wheeler*, 794 F.2d 1228; *accord EEOC v. Local 638*, 700 F.Supp. 739, 743 (S.D.N.Y.1988). While the factors of notice and the ability of the predecessor to provide relief have been deemed "critical," *Wheeler*, 794 F.2d at 1236, no one factor or set of factors is controlling. *See Fennell v. TLB Plastics Corp.*, No. 84 Civ. 8775, 1989 WL 88717 (S.D.N.Y. July 27, 1989).

AT & T-IS argues that neither the establishment of ABI nor the subsequent divestiture by AT & T of the BOCs leads to successorship liability against AT & T-IS. This Court agrees. While plaintiff argues that there were similarities between NY Tel and AT & T-IS, such as employees' salaries and medical plans and that the date employees began work for NY Tel was used by AT & T-IS for pensions and employee stock plans, it is undisputed that AT & T-IS had no notice of Long's claim against NY Tel because none of Long's charges were pending when he was transferred to AT & T-IS. NY Tel's capacity to provide relief weighs against imposition of

liability upon AT & T–IS. This is not a case where, "[f]ailure to hold a successor liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with a complete remedy." *MacMillan Bloedel,* 503 F.2d at 1091–92. Plaintiff's case is not barred because NY Tel no longer exists or because NY Tel is unable to satisfy judgments against it. Accordingly, plaintiff's claims against NY Tel are dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted, except with respect to plaintiff's Title VII claim based on discriminatory termination as to which summary judgment is denied.

SO ORDERED.