**Jose R. RIVERA, Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK USA, Defendant.**

**No. 90 Civ. 6281 (DNE).**

United States District Court, S.D. New York.

Aug. 5, 1992.

Epstein Becker & Green, P.C. by Kenneth J. Kelly and Suzanne Sonner Diviney, New York City, for defendant.

Jose R. Rivera, pro se.

### MEMORANDUM AND ORDER

DOLINGER, United States Magistrate Judge:

*Pro se* plaintiff Joseph Rivera filed this suit on October 1, 1990, seeking damages or back pay and injunctive relief against his former employer, National Westminster Bank. Suing under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5, plaintiff claims that the Bank denied him a promotion and then terminated him because he is Hispanic.

Following the completion of pre-trial proceedings, the parties stipulated to a trial before me pursuant to 28 U.S.C. § 636(c). Plaintiff further agreed to waive any claim of entitlement to a jury trial, thus mooting any possible issue as to the retroactive effect of the jury-trial provision of the Civil Rights Act of 1991. 42 U.S.C.A. § 1981a(C) (West Supp.1992).

On July 9, 1992, the court conducted a bench trial limited to the issue of liability.[1] The following constitute my findings of fact and conclusions of law.

### *The Nature of Plaintiff's Claims*

Plaintiff asserts two claims in this action. First, he asserts that in 1984 he was denied a promotion to a position as a bank officer because of his Hispanic origin. According to plaintiff, he did not subsequently pursue the matter, either because he had been falsely informed that he required a college degree for such a promotion[2] or because he perceived that discriminatory animus by his supervisors made such an application futile.

Second, Mr. Rivera claims that his termination by the Bank on October 29, 1987 was also based on impermissible animus towards him because he is Hispanic. Although he admits that he was officially fired for repeated lateness and concedes that he was late to work on a number of occasions, he insists that he had a valid medical excuse and that a co-worker—a Ms. Nancy Fischer—had at least as bad a record for tardiness and yet she was not only retained, but promoted to a bank officer position.

In explanation for the difference in treatment, plaintiff argues that Bank Vice–President William Mulligan, the officer respon-

---

1. Plaintiff appeared at the trial *pro se*. His motion for appointment of counsel, filed in February 1991, was denied by order filed May 8, 1991, based on doubts as to the substantiality of his claims, *see Jenkins v. Chemical Bank*, 721 F.2d 876, 880 (2d Cir.1983), and his apparent ability to handle this relatively simple case by himself.

2. Plaintiff has a high school degree and 30 credits at John Jay College of Criminal Justice.

sible for firing him, and Ms. Patricia Kearns—plaintiff's immediate supervisor—were both Irish–American and favored Ms. Fischer, who he claims was part Irish–American.

*The Facts*

Plaintiff was hired to work in the Trading Department of the National Bank of North America ("NBNA") on May 23, 1977. He served as an Assistant Trader in that department, performing clerical services to assist the Trader, a Mr. Pedro Nieves.

NBNA was subsequently acquired by defendant National Westminster Bank ("Nat West"). In 1980, Mr. William Mulligan reorganized a portion of the Treasury Department of Nat West and consolidated a set of related service units in a so-called Investment Services Department. Although Mr. Mulligan maintained ultimate responsibility for this department, it was directly supervised at the time by Mr. Steven Laxman. In the absence of Mr. Laxman, supervision was apparently handled by Pedro Nieves.

Mr. Mulligan recruited six or seven persons, including plaintiff, to join the department. These individuals served as retail sales representatives. Their responsibilities were essentially ministerial. At the start of their work day they were required to determine the then-current rates for various Nat West investment products and to input that data into a computer. During the course of the day they took orders for these products, and recorded those transactions on so-called "tickets" before the conclusion of the work day. All of these retail sales representatives received similar training and were thus in a position to perform each other's functions.

At some time in 1986, Nat West acquired certain branches from Bankers Trust Company. As a result, several individuals who had been officers at Bankers Trust joined the Investment Services Department of Nat West. Of particular relevance, Ms. Patricia Kearns, who was one of the officers from Bankers Trust, became the supervisor of the unit. Ms. Kearns, who retained her status as an officer, had performed investment advisory services at Bankers Trust and continued to do so at Nat West. Thus her responsibilities were of a different order from the routine, nondiscretionary functions performed by plaintiff and his fellow retail sales representatives.

Each employee of the Department was given an annual evaluation, which was prepared by the supervisor and approved by Mr. Mulligan. The evaluation reflected both verbal comments and numerical ratings in a number of different job performance categories, as well as an overall numerical rating. All numerical ratings were on a scale of 1 to 5. According to Mr. Mulligan, a rating of 1 was given only to a "superstar"; a rating of 2 reflected an above-average employee; a 3 denoted an individual who performed his work consistently but without any specially noticeable extra effort or results; a 4 indicated someone who needed to improve his performance; and a 5 reflected a clearly unsatisfactory performance, which generally meant that the employee could not continue at the Bank. At the time of the annual evaluations, the employee was given a copy and had the opportunity to comment upon the ratings as well as to record his or her career goals and plans for advancement within the Bank.

The earliest evaluation of plaintiff that is found in the record is for the period ending July 1983. It gave plaintiff a final performance rating of 3.35 and noted among the objectives for plaintiff to meet, "increas[ing] knowledge of Treasury products and procedures." (Deft's Exh. I.) Plaintiff's supervisor commented that plaintiff "has a positive attitude toward his responsibilities. He has demonstrated improvement in a number of areas and is aware of those areas which require more work." (*Id.*) Mr. Rivera wrote in response that he considered his evaluation to be fair. (*Id.*)

In August 1984, plaintiff received a very similar evaluation. He was given a generally satisfactory set of ratings—represented by the number 3—with three exceptions. (Deft's Exh. J.) First, echoing an observation from the prior evaluation, he was given a rating of 4 for "Knowledge," with the

added comment that he "must increase effo[r]t to expand knowledge of Treasury products. If not, his future growth will be limited." (*Id.*) In this same vein, the evaluation noted that plaintiff's "knowledge of Treasury products" had "not increased significantly." (*Id.*) Second, in the related area of "Business Development," Mr. Rivera received another 4, and was told that he "[m]ust increase [his] knowledge of investment products so as to better counsel customers." (*Id.*) Finally, in the area denominated "Leadership," he also received a rating of 4, with the added comment that he "[m]ust make extra effort to get along with others. Must be more receptive to constructive criticism." (*Id.*)

This third criticism of plaintiff apparently resulted from a series of incidents in which plaintiff had engaged in actions upsetting to his co-workers. Indeed, this problem had previously been mentioned in a memorandum to him from Mr. Laxman, who noted a recent "complaint from a female member of my staff accusing you of rude and insulting behavior." (Deft's Exh. V.) Mr. Laxman noted in the memorandum that he had previously spoken to plaintiff about his "behavior," and then warned plaintiff that if his "performance [in dealing with his co-workers] does not improve or if there are any further incidents of this nature, you will be terminated from the Bank." (*Id.*)

Plaintiff offered a response to his 1984 evaluation in which he conceded its fairness except as to his ability to get along with other staff. As to this matter, plaintiff wrote that "I feel I have come a long way in resolving conflicts with the personnel of my dep[ar]t[ment]." (Deft's Exh. J.) He also noted, in a section of the evaluation form labelled "Note employee career interests and comments," that he intended "to expand my knowledge of the Treasury

products" offered by the Bank and ultimately to become a bank officer. (*Id.*)

Plaintiff sought quickly to realize his ambition. Thus he approached Mr. Mulligan shortly after receiving the 1984 evaluation, and well before he had had time to increase his knowledge of the Bank's investment offerings, and requested that he be considered for promotion to bank officer. According to Mr. Mulligan, a bank officer within the Investment Services Department would have been required to advise clients as to investment decisions, and thus would have been expected to have obtained various certifications—known as Series 52 (for municipal investments) and Series 7 (for other investment vehicles)—prior to being considered for such a promotion. He also testified that, as a general matter, he would have expected promotions to be given only to those employees consistently earning performance ratings of 1 or 2.

In any event, in response to plaintiff's inquiries, Mr. Mulligan advised him that he needed to obtain specialized training in the details of all investment products, including the so-called series 52 and series 7 certification programs.[3] Plaintiff subsequently did pursue one course given by the New York Investment Forum that could have led to a series 52 certification[4] (*see* Deft's Exh. M. at 6), but he never sought series 7 certification and he never again sought promotion, either by informal request to Mr. Mulligan or by formally applying for posted job openings.[5]

Plaintiff's subsequent performance in his job, as reflected in his evaluations, remained essentially the same in 1984–85 and 1985–86, and his position at the Bank was unchanged. His last year at Nat West, however, proved quite rocky.

The most troubling incident occurred on May 12, 1987. According to Ms. Kearns,

---

**3.** Plaintiff claims that Mr. Mulligan told him that he needed a college degree for such a promotion, an assertion that Mr. Mulligan denies. I find Mr. Mulligan to be entirely credible, and note that plaintiff's assertion seems especially implausible since Mr. Mulligan himself was not a college graduate.

**4.** The record reflects that plaintiff never obtained series 52 certification although he did enroll in the course. He never took a course leading to series 7 certification.

**5.** According to Mr. Mulligan, an employee could seek promotion either by informally raising the matter with his supervisor or by formally applying for posted openings.

whose testimony I credit on this matter, she requested Mr. Rivera to perform certain tasks that were within his area of responsibility, and he then refused to do so and subjected her to a stream of verbal abuse. According to Ms. Kearns, later the same day another employee, a Ms. Ginny Hall, asked plaintiff for a certain document, and he then launched another stream of invective at her. Ultimately, Ms. Kearns testified, she became so upset and fearful of plaintiff that she fled to the ladies' room, where she remained until plaintiff had left the office.[6]

These incidents led to a meeting the next day involving Mr. Mulligan, Ms. Kearns, and plaintiff. According to Mr. Mulligan, whose testimony I credit, plaintiff admitted the incident and apologized.[7]

As a result of this incident, Mr. Mulligan placed plaintiff on formal probation for three months. In the memorandum that he sent to Ms. Rivera—to which plaintiff apparently never objected—Mr. Mulligan recounted the incident in general terms, informed plaintiff that he was to remain on probation until August 12, 1987, and warned him that any repetition of such behavior either during the probationary period or for a period of twelve months thereafter would be grounds for dismissal. (Deft's Exh. Y.)

Apart from this incident, plaintiff encountered problems on the job because of his frequent failures to appear at work at or near his scheduled work time of 8:30 A.M. He was apparently not alone in the failing, at least at first, since Mr. Mulligan took notice in the Spring or early Summer of 1987 that personnel in the Department were frequently not present at the starting time. According to Mr. Mulligan, this failing was considered serious because branch offices typically called by 8:30 A.M. seeking rate information concerning the Bank's investment products, and plaintiff and his co-workers were responsible for responding to those inquiries.

Accordingly, Mr. Mulligan informed Ms. Kearns of the problem and she undertook to advise her subordinates that they had to appear on time. To ensure compliance, Ms. Kearns also kept a daily record of late appearances for each employee under her supervision. This form of record-keeping apparently began in July 1987 and continued throughout the relevant time period. Ms. Kearns' lists reflect that from July 29, 1987 through October 14, 1987, plaintiff was late by at least 25 minutes on twenty-one occasions. (Deft's Exhs. O & O–1.) Only one other member of the department, Ms. Nancy Fischer, was late more than once during this period, and she was recorded as late seven times up to October 14. (*See* Deft's Exhs. P, Q, R, S.)

Towards the tail end of this period, in mid-September 1987, plaintiff received his last performance evaluation. (Deft's Exh. M.) Prepared by Mr. Mulligan, it reflected what he characterized as a deterioration in performance over the past year. This deterioration was reflected in the overall evaluation score of 4 that Mr. Mulligan gave plaintiff, as well as in low scores in many of the individual categories. (*See id.*) Thus, in "Problem Solving/Decision Making," Mr. Mulligan gave him a 4 rating, noting that "Jose needs to be more aware of team situations and how his actions may detrimentally [a]ffect them[,] causing problems." (*Id.*) In the category "Communication," Mr. Mulligan also gave him a rating of 4, noting that "Jose is very reluctant to discuss problems and rarely seeks assistance." (*Id.*)

In regard to "Business Development," Mr. Mulligan gave plaintiff a 5, the lowest possible rating, and reiterated the previously noted admonition about knowledge of investment products—"Jose needs to make more of an effort to expand his product knowledge and must show more initiative in cross selling." (*Id.*) In the category labelled "Self Management," plaintiff received a 4, with the comment that "Jose

---

**6.** The details of the incident were memorialized by Ms. Kearns the next day in a memorandum to Mr. Mulligan. (Deft's Exh. X.)

**7.** Plaintiff denies that he was guilty of misconduct in this incident and claims that Ms. Kearns was abusive to him. I find Mr. Rivera's testimony unpersuasive in this regard.

must improve his ability to work within a team and make more efficient use of his time. His attendance record is not satisfactory (12 days ill[;] many Mondays and Fridays)." (*Id.*) Finally, in the category "Concern for Quality," Mr. Mulligan gave plaintiff a 4 rating and observed "Number of errors on trade tickets has increased[;] handwriting must improve."

The concluding comments by Mr. Mulligan noted the deterioration in plaintiff's performance. (*Id.*) He also added that plaintiff "must improve his attitude and quality of performance." (*Id.*)

Unlike the prior evaluations, this one drew a protest by plaintiff. In a memorandum prepared on September 16, 1987, the day he apparently received the appraisal, Mr. Rivera objected to Mr. Mulligan's comments. (*See* Pl.Exh. 14.) In general terms he insisted that the criticism "is unjust and biased," that he had worked very hard when the Department was short-staffed, that his spotty attendance record was attributable to a "heart condition," and that his handwriting was adequate. (*Id.*)

Plaintiff's difficulties with the Bank reached a crescendo in October 1987. As noted, he had been late 21 times between July 29 and October 14, 1987.[8] On October 15, 1987, when plaintiff apparently again arrived late—the third time that week—Mr. Mulligan met with him and, besides reminding him that he was still on probation,[9] warned him that if he was late again, he would be terminated. (Deft's Exh. Z.) According to Mr. Mulligan, during their discussion Mr. Rivera ascribed his frequent tardiness to "problems with the trains, parking his car, and ... walk[ing] his dog." (*Id.*) Mr. Mulligan insists that plaintiff did not mention heart palpitations, which plaintiff now blames for his difficulty with punctuality. I credit Mr. Mulligan's statement in this respect.

Two weeks later, on October 29, 1987, plaintiff was thirty minutes late in reporting for work. (Deft's Exh. BB.) According to Mr. Mulligan, this was the third time that plaintiff had been late since the warning on October 15, 1987. (*Id.*) In their meeting that day, Mr. Rivera claimed that he had arrived late because his subway had been rerouted and he had not wanted to change trains. (*Id.*) Mr. Mulligan then advised plaintiff that he was being terminated because of his "continued behavioral problems" while on probation. (*Id.*)

On December 16, 1987, plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights. He claimed discrimination because of national origin, noting that he had been discharged on October 29, 1987, "allegedly for lateness, whereas similarly situated non-Hispanic [employees] with similar attendance were not so treated." (Deft's Exh. F.) He also noted that "[p]revious to [his] discharge [he] protested the unwarranted comments in [his] salary review/job performance evaluation." (*Id.*) Following the completion of an investigation (*see* Deft's Exh. B), the Division issued a finding of no probable cause on July 27, 1990. (Deft's Exh. A.)

This lawsuit followed.

## ANALYSIS

1. *Subject–Matter Jurisdiction Over Plaintiff's Promotion Claim*

██ At the trial, defendant for the first time raised a question as to this court's jurisdiction to consider plaintiff's promotion claim. Counsel argued that plaintiff had not asserted a claim based on non-promotion in his administrative complaint and accordingly was barred from seeking adjudication of that claim in court. Because a court is always under an obli-

---

**8.** Plaintiff insists in general terms that Ms. Kearns' records are inaccurate in that they understate the extent of Ms. Fischer's late appearances and exaggerate his. Although Ms. Kearns is concededly a friend of Ms. Fischer, I have no reason to believe that she falsified her records in this regard, and I note that Ms. Fischer was in fact placed on probation as a result of her late appearances, which totalled seven by October 14, and eight by October 30, 1987.

**9.** This warning may have been technically inaccurate since plaintiff's prior probation was to expire in August 1987, but in effect he was subject to dismissal for misconduct for 15 months from the time of the May 12 incident. (*See* Deft's Exh. Y.)

gation to examine its own jurisdiction to proceed, *see, e.g., Morgan v. United States,* 968 F.2d 200, 203 (2d Cir.1992) (citing *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908)), I briefly address that question.

Exhaustion of administrative remedies is a jurisdictional pre-requisite to judicial consideration of a discrimination claim under Title VII. *See, e.g., Gomes v. Avco Corp.,* 964 F.2d 1330, 1334 (2d Cir.1992). Nonetheless, even if the plaintiff has not specified in his administrative filing the precise claim that he seeks to pursue in court, he will be deemed to have exhausted his remedies if the claims asserted in court are "reasonably related to the allegations in [plaintiff's EEOC] complaint." *Id.* at 1334 (alterations in original) (quoting *Kirkland v. Buffalo Bd. of Educ.,* 622 F.2d 1066, 1068 (2d Cir.1980) (per curiam)). Moreover, the Second Circuit has noted that, in evaluating the scope of the "often inarticulately framed charge" of a *pro se* complainant, the court should "take into account the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979), *rev'd on other grounds,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)).

In this case, although plaintiff's *pro se* administrative complaint highlighted his termination, he also noted that, prior to his discharge, he had complained of his 1987 "salary review/job performance evaluation." (Deft's Exh. F.) Absent any other evidence, this cryptic reference to a pretermination evaluation could not fairly be viewed as likely to trigger any investigation of plaintiff's failure to obtain a promotion, but in fact the State Division did inquire as to this matter. Thus, the Investigation Report of the State Division of Human Rights notes:

> During the course of the investigation [,] areas of disagreement relating to complainant's employment other than punctuality were addressed. One was the

fact that complainant while employed by respondent had not been promoted. (Deft's Exh. B.) The report goes on to note that "[t]his was not an issue raised in the complaint, and no evidence was presented to show that this area of complainant's work history was a consideration in his termination." (*Id.*)

Although the question is not free from doubt, I conclude that this reference to the promotion problem sufficiently evidences the agency's consideration of it to demonstrate that plaintiff exhausted his administrative remedies with respect to his claim of denial of promotion. Although the nature of the agency's consideration of this issue is somewhat unclear from the report, it is fair to infer that the investigator made some sort of evaluation as to whether the failure to promote plaintiff during his tenure at the Bank constituted an act of discrimination, in which case it might well have been relevant to the motivation for his termination.

2. *The Statute of Limitations, and the Merits of the Failure-to-Promote Claim*

In its answer to the complaint, defendant pled a time bar as an affirmative defense to the promotion claim. It did not, however, seek dismissal of the claim by motion, and did not mention the limitations defense in the joint pre-trial order, choosing instead to specify solely a defense on the merits of the claim. (*See* Pre-trial Order at 3.)

■■■■ Although it could be argued that this course of conduct by defendant amounts to a waiver of the limitations defense, *cf. Joseph v. Edeskuty & Assocs. v. Jacksonville Kraft Paper Co.,* 702 F.Supp. 741, 745 (D.Minn.1988); *Benveniste v. Eiseman,* 119 F.R.D. 628, 629 (S.D.N.Y.1988); *Reliable Tire Distrib. v. Kelly Springfield Tire Co.,* 623 F.Supp. 153, 154–56 (E.D.Pa. 1985); *Burton v. Northern Dutchess Hosp.,* 106 F.R.D. 477, 480–41 (S.D.N.Y. 1985); *Vozeh v. Good Samaritan Hosp.,* 84 F.R.D. 143, 143–44 (S.D.N.Y.1979),[10] we

---

10. Defendant's limitations argument is well-founded. An aggrieved person is required to

file his administrative claim within 300 days after the alleged discriminatory act. *See, e.g.,*

need not decide that issue since there is no merit to plaintiff's claim.

■ Plaintiff claims that he was denied a promotion for reasons related to his Hispanic origin, but he offers no evidence to support that claim. Rather, the evidence reflects that defendants made no effort to promote him because he was not qualified for promotion.

■ To establish a *prima facie* case of race or national origin discrimination based upon a failure to promote, a plaintiff must proffer evidence demonstrating (1) that he "belongs to a protected class"; (2) that "[he] applied for and was qualified for a position for which [his] employer was seeking applicants"; (3) that he was rejected despite his qualifications; and (4) that the position remained open after he was rejected, or was later filled by a person who was not a member of a protected group. *See, e.g., Sweeney v. Research Found. of State Univ. of New York*, 711 F.2d 1179, 1185 (2d Cir.1983); *Long v. AT & T Info. Sys., Inc.*, 733 F.Supp. 188, 202 (S.D.N.Y.1990); *Gibbs v. Consolidated Edison Co.*, 714 F.Supp. 85, 88 (S.D.N.Y.1989). Alternatively, if the plaintiff presents direct evidence of actions or remarks by the employer that reflect a discriminatory animus, this may be sufficient, depending on the circumstances, to allow an inference of discriminatory intent and thus to establish a *prima facie* case. *See, e.g., Long v. AT & T Info. Sys., Inc.*, 733 F.Supp. at 203; *Ritter v. General Electric Co.*, No. 1:88–CV–2177 RHH, 1988 WL 163067, *3 (N.D.Ga. April 21, 1988).

If the plaintiff meets his *prima facie* burden, the employer must then articulate a legitimate, non-discriminatory reason for not promoting him. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95,

67 L.Ed.2d 207 (1981); *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991). If it does so, then plaintiff must establish that the stated reason was a pretext for a discriminatorily-motivated employment decision. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116–17 (2d Cir.1991).

■ As an alternative to this pretext analysis, the plaintiff may prevail if he establishes that the challenged employment decision resulted at least in part from discriminatory animus. Specifically, he must demonstrate that "race, color, religion, sex or national origin was a motivating factor for any employment practice even though other factors also motivated the practice." 42 U.S.C.A. § 2000e–2(m) (West Supp. 1992). To meet this standard, plaintiff must still satisfy his initial *prima facie* burden, and if the employer then articulates a non-discriminatory reason for the action, the plaintiff must demonstrate that a discriminatory animus constituted such "a motivating factor." *See, e.g., Ostrowski v. Atlantic Mutual Ins. Cos.*, 968 F.2d 171, 180–81 (2d Cir.1992); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992), *petition for cert. filed*, 60 U.S.L.W. 3860 (No. 91–1975) (June 8, 1992).

In this case, plaintiff failed to meet his initial burden. Although a member of a protected group, he did not demonstrate that he was qualified for the promotion that he sought. As Mr. Mulligan testified, if named a bank officer in the Investment Services Department, plaintiff would have been expected to serve, in effect, as an investment adviser to clients and hence needed to be thoroughly versed in the investment products handled by the Bank. The specific criteria for such expertise in-

---

*Gomes v. Avco Corp.*, 964 F.2d at 1332. In this case, the only allegedly discriminatory action complained of by plaintiff concerning his non-promotion was defendant's failure to honor plaintiff's 1984 request to Mr. Mulligan that he be given a promotion to bank officer. Plaintiff's 1987 complaint to the State Division of Human Rights, even if construed as encompassing a denial-of-promotion claim, is well beyond the statutory time limit. Moreover, although

plaintiff's testimony could be construed as asserting that defendant had a continuing policy to deny promotions to Hispanics, the last action purportedly taken by defendant to carry out this policy was the 1984 failure to promote plaintiff, since he conceded that he never thereafter sought promotion. Under these circumstances, his claim would be time-barred even if viewed as alleging a continuing course of conduct. *See, e.g., Gomes v. Avco Corp.*, 964 F.2d at 1332.

volved the so-called series 52 and series 7 certifications, which attest to the individual's training and expertise with regard to municipal and other investment vehicles, respectively.

In 1984, plaintiff had no such training or expertise. Indeed, one of the principal criticisms found in all of plaintiff's performance appraisals up to the time of his termination was his need—and evident failure—to acquire greater familiarity with the Bank's investment products. This criticism, which plaintiff never contested, is further borne out by the fact that plaintiff, although he enrolled in a series 52 course given by the New York Investment Forum, never took the series 52 examination. (*See* Deft's Exh. M. at 6.) Moreover, he never undertook any effort to obtain training and certification with regard to non-municipal investments products. This evidence is sufficient to justify the conclusion that plaintiff was not promoted because he lacked the skills that would have been required of him as a bank officer.[11]

Under these circumstances, plaintiff obviously has not shown that he was qualified for the position to which he was denied promotion. Accordingly, he has failed to establish a *prima facie* case, and the promotion claim must be dismissed.

### 3. *The Termination Claim*

█ Plaintiff was terminated on October 29, 1987, ostensibly because of his persistent tardiness. Defendant also notes that he had an intermittent history of abusive conduct towards co-workers, which apparently contributed to the decision to fire him.

Plaintiff's claim is premised on his twin contentions that the tardiness records compiled by his immediate supervisor, Patricia Kearns, exaggerated the number of days on which he arrived late at work and that defendant discriminated against him by terminating him even though one of his co-workers—Ms. Fischer—had a comparable record of late appearances and was not only not fired, but promoted to a bank officer position.

█ To establish a *prima facie* case of discrimination with respect to his termination, plaintiff must show (1) that he was a member of a protected group; (2) that he was qualified for the job he was performing; (3) that he was discharged; and (4) that the discharge occurred in circumstances from which one may infer a discriminatory motive. *See, e.g., Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir.1983). Plaintiff has not made such a showing.

With respect to plaintiff's record of absences, I credit Ms. Kearns' testimony that her contemporaneously compiled lists of late appearances by all employees working under her supervision are accurate. The log pertaining to plaintiff reflects that from July 29, 1987 until October 14, 1987, he was late twenty-one times. (Deft's Exhs. O & O-1.) Moreover, after being warned on October 15, 1987 by Mr. Mulligan that no further lateness would be tolerated, plaintiff was late three more times within the next two weeks (*see* Deft's Exh. BB), for a total of 24 occasions on which he was late within a three-month period. This record far exceeds the tardiness of any of plaintiff's co-workers. Indeed, the only other employee late more than once during this period was Ms. Fischer, who was late seven times in the same time period. (Deft's Exh. R; *see* Deft's Exhs. P, Q, S.)

As Mr. Mulligan testified, the Bank had a legitimate concern with these employees' ability to appear for work at 8:30 A.M., the scheduled starting time, because the branch offices started calling in by that time to learn from the retail sales representatives the market rates for the Bank's various investment products. The genuineness of Mr. Mulligan's concern about this

---

11. Plaintiff also provided no evidence of discriminatory animus. He concedes that his evaluations were fair with the exception of the last one, *shortly before his* termination. He also concedes that no hostile remarks were made based on his ethnicity. He offers no evidence that other Hispanics were not promoted; indeed the only other Hispanic employee mentioned at trial was Mr. Pedro Nieves, who was a bank officer and, for a time, plaintiff's supervisor, and who was later promoted to Assistant Vice President.

matter is underscored by his having advised Ms. Kearns, apparently in July 1987, that employees in her unit were not arriving on time, thus preventing the branch offices from promptly obtaining necessary information. It was apparently in response to this stated concern that Ms. Kearns began keeping track of all late appearances by her subordinates.[12]

In view of the disparity between the lateness record of plaintiff and that of all of his co-workers, including Ms. Fischer, and in view, as well, of the perceived importance of on-time arrival by the retail service representatives, Mr. Rivera's discharge after a prior and very clear warning is not itself suggestive of any discriminatory motivation by Mr. Mulligan.

Plaintiff claims that this discharge was suspect not only because Ms. Fischer was more leniently treated, but also because his latenesses were attributable to heart palpitations, a condition for which he was seeking medical treatment. Neither argument is persuasive.

As noted, Ms. Fischer was late far less frequently than Mr. Rivera, and in any event she was placed on probation for her actions, a step that—according to Ms. Kearns—led to the elimination of the problem. Moreover, although she was promoted to bank officer status, this was not done by Mr. Mulligan but by another supervisor at a time when Ms. Fischer worked in another department, prior to her assignment to the Investor Services desk. In any event, plaintiff fails to demonstrate that any leniency to Ms. Fischer evidences a discriminatory animus toward him.[13]

As for plaintiff's medical excuse, I find his testimony not to be credible. Indeed, Mr. Mulligan credibly testified that neither on October 15, when he gave plaintiff a final warning, nor on October 29, when plaintiff was terminated, did he indicate that his physical condition prevented him from arriving on time. (*See also* Deft's Exhs. Z & BB.) Plaintiff also offered no corroborative evidence at trial to suggest that his frequent latenesses were attributable to anything other than an indisposition to arriving as early as he was required by the Bank.

In considering whether the circumstances of plaintiff's termination permit an inference of discrimination, it also bears emphasis that, besides his consistent tardiness, plaintiff's performance was deficient in other respects in the last year. Of particular concern, he had had a very serious run-in with his supervisor, Ms. Kearns, in May 1987, in which he had acted abusively towards her, and a similar encounter with a co-worker the same day. These incidents— the details of which were recounted at trial by Ms. Kearns in testimony that I credit— were sufficiently serious to lead Mr. Mulligan to place plaintiff on formal probation with a warning that any repetition within a fifteen-month period would lead to plaintiff's termination.

In addition, plaintiff's performance, reflected in his September 1987 evaluation, had become seriously deficient in a number of areas. (Deft's Exh. M.) As noted, his overall performance was rated "somewhat less than satisfactory"—that is, he was given a numerical rating of 4. (*Id.*). In addition, he received "somewhat less than satisfactory" ratings in four of seven categories and an "unacceptable rating"—that is, a rating of 5—in one other category. (*Id.*)

Under all of these circumstances, I conclude that plaintiff has not met his burden to establish, as part of his *prima facie* case, that his termination occurred in circumstances permitting an inference that his discharge was, in whole or in part, motivated by discriminatory animus.

---

12. Plaintiff testified that although the official starting time was 8:30 A.M., Ms. Kearns allowed a 15–minute grace period. This may well be the case, but is inconsequential since all of Mr. Rivera's recorded late appearances took place after 8:45 A.M.

13. Plaintiff suggests that Ms. Kearns was biased in favor of Ms. Fischer by virtue of their conceded friendship. Even if true, this would not suggest discriminatory animus towards plaintiff based on his Hispanic origin. Moreover, although plaintiff suggests in conclusory terms that Mr. Mulligan and Ms. Kearns were well disposed towards Ms. Fischer because she was partly of Irish origin, he offers no evidence to support this assertion.

Moreover, even if we were to assume, for the sake of argument, that he met that initial burden, for the reasons already noted I would conclude that the Bank has proffered a non-discriminatory reason for discharging plaintiff—his consistent tardiness—and that plaintiff has failed to establish either that this stated reason was pretextual or that discriminatory animus was a motivating factor in his termination.

In sum, plaintiff has failed to establish any basis for his claim that his discharge violated the terms of Title VII.

### CONCLUSION

For the reasons stated, plaintiff's complaint shall be dismissed. The Clerk is to enter judgment accordingly.

SO ORDERED.